IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL NAIL, CORP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil No. 3:23-CV-02746-K |
| | § | |
| PRIMESOURCE BUILDING | § | |
| PRODUCTS, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant PrimeSource Building Products, Inc.'s ("PrimeSource") Renewed Motion to Dismiss (the "Motion to Dismiss") and brief and appendix in support thereof, Doc. Nos. 24–25, 28, Plaintiff National Nail, Corp.'s ("National Nail") Response in Opposition to Defendant's Renewed Motion to Dismiss, Doc. No. 30, and PrimeSource's Reply Brief in Support of Its Renewed Motion to Dismiss and appendix in support thereof. Doc. Nos. 33–34.

Upon consideration of the parties' submissions, the Court **GRANTS** PrimeSource's Motion to Dismiss in part and **DENIES** it in part. National Nail holds patents for fasteners used to secure wooden and other boards to surfaces like joists. It claims that one of its competitors, PrimeSource, has directly and willfully infringed these patents by making, marketing, and selling a fastener called the "Grip-Rite Ninja." National Nail also claims that PrimeSource has induced others to infringe the patents by supplying them with the Grip-Rite Ninja for use or resale. PrimeSource now moves

1

to dismiss National Nail's claim for direct infringement of the earliest patent, its claims for inducing infringement before the filing of this suit, and its claims for willful infringement before the filing of this suit. Because PrimeSource's challenge to the direct infringement charge turns on its interpretation of language in National Nail's earliest patent, and because National Nail advances a plausible contrary interpretation, the Court will let the direct infringement claim proceed at least until the Court resolves the parties' interpretive disagreements at the claim construction stage. The Court reaches a different result with respect to the pre-suit infringement claims. The Court finds National Nail's allegations that PrimeSource knew of National Nail's patents before this litigation to be lacking, so the Court cannot infer that PrimeSource induced others to infringe the patents or infringed them willfully in the pre-suit period. The Court believes National Nail may be able to cure this deficiency and will permit it to try to do so. The Court therefore **DISMISSES** National Nail's claims for pre-suit infringement without prejudice.

I.   BACKGROUND

Unless otherwise noted, the Court draws the following facts from National Nail's Amended Complaint and assumes that they are true. Doc. No. 21.

A. **National Nail and Its Patents**

National Nail manufactures and distributes products used in construction. *Id.* ¶ 7. Among these products are fasteners used to secure boards to joists running underneath them. *Id.* ¶¶ 11–13. As relevant here, National Nail is the assignee of three

patents for inventions in the field of fastening, each of which it notes in a marking on a fastener it calls the "CAMO EdgeX Clip." *Id.* ¶¶ 25–27, 31.

The earliest patent is United States Patent No. 10,378,218 (the "'218 Patent"). *Id.* ¶ 25. The '218 Patent contemplates a fastener unit with a "grip element" for pinning a board to a joist, a "spacer block" to separate the board from an adjacent board, and "resilient compression elements" used to hold the fastener in place next to a board before securing the board to the joist. Doc. No. 21-2 at 33–34. At issue in this case is Claim 17 of the patent, which covers:

> A fastener unit adapted to secure at least one board to a support, the fastener unit comprising:
>
> a spacer block defining a first fastener hole, the spacer block having a thickness extending from a front surface to a rear surface, the thickness corresponding to a gap between a first board and a second adjacent board, the spacer block including a vertical axis;
>
> a grip element extending from the spacer block, the grip element configured to fit in and engage a first groove defined by the first board, without the spacer block extending into the first groove, the grip element configured to receive a fastener through at least a portion of the grip element;
>
> wherein the spacer block includes a first resilient compression element extending from the spacer block, the first resilient compression element being vertically compressible toward a first plane that is transverse to the vertical axis, the first resilient compression element configured to compress and fit in, and forcibly expand within the first groove of the first board, thereby securing the spacer block in a position adjacent the first groove defined by the first board, with the spacer block being disposed in the gap between the first board and the second adjacent board.

*Id.*

The remaining two patents are United States Patent No. 11,840,848 (the "'848 Patent") and United States Patent No. 11,898,357 (the "'357 Patent"). Doc. No. 21 ¶¶ 27–28. Both cover fastener technologies that are, for present purposes, similar to the technologies claimed in the '218 Patent. Doc. Nos. 21-3, 21-4.

A brief illustration drawn from the '218 Patent will clarify the operation of the patented technologies. In the below image, the fastener unit abuts a grooved board, which rests on a joist. Resilient compression elements, in the form of wings, connect to a spacer block at the middle of the fastener; a grip element, in the form of an inverted "u," passes through the spacer block; and a screw passes through the grip element toward the joist.



*Id.* at 5 (cosmetic modifications by the Court).

A user begins securing the board to the joist by compressing the wings until they fit in the groove, where they naturally expand to meet the boundaries of the groove and hold the fastener in place. *Id.* at 25–26. In this position, the grip element extends into the groove. *Id.* The user then drives the screw into the joist, causing the screw head to pull the grip element to the base of the groove and thereby pin the board to the joist. *Id.*



*Id.* at 9 (cosmetic modifications by the Court).

Because the pictured fastener is two-sided, the user could, alternatively, compress its wings and slot it between one board on each side, allowing the user to secure

5

two adjacent boards to a joist at once. *Id.* at 26. In that arrangement, the width of the spacer block would ensure that a gap remains between the boards. *Id.*



*Id.* at 10 (cosmetic modifications by the Court).

### B. PrimeSource's Alleged Infringement

According to National Nail, at some point PrimeSource began to infringe the '218, '848, and '357 Patents directly by making, marketing, and selling a fastener called the "Grip-Rite Ninja." Doc. No. 21 ¶¶ 16, 35–74. PrimeSource, like National Nail, distributes fasteners for construction, and the two entities sell their products to the same customers through the same distribution channels, including trade shows. *Id.*

6

¶¶ 13, 32. Its allegedly infringing Grip Rite Ninja fastener, pictured below, helps customers install grooved deck boards.



*Id.* ¶¶ 16–21.

In addition to making, marketing, and selling the Grip-Rite Ninja, National Nail has allegedly induced others to use it. PrimeSource encourages customers to use the fastener, including in a video demonstration published online, and offers customers a "step-by-step guide" for using the product. *Id.* ¶¶ 20–22. It also supplies the fastener to third parties for resale. *Id.* ¶¶ 43, 52, 72.

On December 12, 2023, the same day the '848 Patent issued, National Nail sued PrimeSource for infringement of the '218 and '848 Patents. Doc. No. 1 ¶¶ 24–45; Doc. No. 21-3 at 2. PrimeSource filed a motion to dismiss, and National Nail responded by filing an amended complaint, which is the live pleading in this case. Doc. Nos. 18, 21. The '357 Patent having issued between the filing of the original and amended pleadings, National Nail now asserts claims for direct and induced infringement of the '218, '848, and '357 Patents. Doc. No. 21 ¶¶ 35–74. National Nail

7

specifically alleges that PrimeSource's infringement of the '218 and '848 Patents "has been willful and deliberate." *Id.* ¶¶ 45, 54.

PrimeSource has moved to dismiss (1) National Nail's claim for direct infringement of the '218 Patent, (2) National Nail's claims for induced infringement of the '218, '848, and '357 Patents in the period before National Nail filed suit, and (3) National's Nails claims for willful infringement in the same period. Doc. Nos. 24–25. National Nail has responded and, in doing so, denied advancing any theory of pre-suit induced or willful infringement of the '848 and '357 Patents. Doc. No. 30 at 14 n.10. The Court therefore construes PrimeSource's motion as directed solely to claims for infringement of the '218 Patent. With this understanding, the Court denies the first branch of the motion to dismiss and grants the second and third branches without prejudice to the filing of an amended complaint.

## II. LEGAL STANDARD

In patent cases, Fifth Circuit law governs the procedure applicable to motions to dismiss for failure to state a claim. *AMG Prods., Inc. v. Dirt Cheap, LLC*, 2019 WL 2484260, at *2 (E.D. Tex. Mar. 12, 2019), *rep. & rec. adopted sub nom. AMG Prods., Inc. v. Fry's Elecs.*, 2019 WL 1578053 (E.D. Tex. Apr. 11, 2019); *cf. also Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1259 (Fed. Cir. 2018) (the Federal Circuit reviews "procedural issues, including the grant of a motion to dismiss, according to the law of the respective regional circuit"). The Court will grant a motion to dismiss a

claim if the plaintiff's factual allegations, taken as true, fail to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. DISCUSSION

The Court denies PrimeSource's motion to dismiss National Nail's claim for direct infringement of the '218 Patent in the next subsection. The Court then grants PrimeSource's motion to dismiss National Nail's claims for pre-suit induced and willful infringement without prejudice in the two subsections following.

### A. Direct Infringement of the '218 Patent

The Court first rejects PrimeSource's challenge to National Nail's claim for direct infringement of the '218 Patent. Although PrimeSource may be correct that its allegedly infringing Grip-Rite Ninja fastener fails to satisfy the limitations of the sole asserted claim of the '218 Patent, the Court could only reach this conclusion by resolving an interpretive dispute related to the claim that the Court can more appropriately address at the claim construction stage.

A party directly infringes a patent if, without authority, it "makes, uses, offers to sell, or sells [the] patented invention, within the United States or imports into the United States [the] patented invention during the term of the patent." 35 U.S.C. § 271(a). A product qualifies as the "patented invention" under this standard only if it contains each element, or a substantial equivalent of each element, of a claim of the patent. *See Arigna Tech. Ltd. v. Bayerische Motoren Werke AG*, 2022 WL 610796, at *2 (E.D. Tex. Jan. 24, 2022).

9

The correspondence between the product and the claim may depend on a disputed interpretation of the claim's limitations, in which case the Court may ultimately have to resolve the dispute. That does not mean that the Court resolves the dispute at the pleading stage. At that stage, the Court's interpretive role is limited. Although the Court may reject constructions of a claim that are implausible or contradict the claimant's allegations, *see Ottah v. Fiat Chrysler*, 884 F.3d 1135, 1141–42 (Fed. Cir. 2018); *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1354 (Fed. Cir. 2021), the Court leaves more serious interpretive disputes for resolution at the claim construction stage. *See Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1349 (Fed. Cir. 2018); *Kirsch Rsch. & Dev., LLC v. Atlas Roofing Corp.*, 2020 WL 8363154, at *3 (E.D. Tex. Sept. 29, 2020).

PrimeSource's motion to dismiss National Nail's claim for direct infringement of the '218 Patent has triggered a dispute of this type. National Nail asserts Claim 17 of the patent, which PrimeSource reads to require the combination of a fastener unit with one or more boards. Doc. No. 21 ¶ 36; Doc. No. 25 at 8. National Nail reads the same claim to require a fastener unit but not necessarily any boards. Doc. No. 30 at 10. Since the allegedly infringing Grip-Rite Ninja fastener apparently does not come with boards, PrimeSource's liability for direct infringement hinges on which reading is better.

Both readings find at least some support in text of Claim 17. In relevant part, Claim 17 requires a fastener unit:

> wherein the spacer block includes a first resilient compression element extending from the spacer block, the first resilient compression element

10

> being vertically compressible toward a first plane that is transverse to the vertical axis, *the first resilient compression element configured to compress and fit in, and forcibly expand within the first groove of the first board, thereby securing the spacer block in a position adjacent the first groove defined by the first board, with the spacer block being disposed in the gap between the first board and the second adjacent board*.

Doc. No. 21-2 at 33–34 (emphasis added).  The board requirement advocated by PrimeSource arguably follows if the object of the phrase "configured to" does not include the final clause of the italicized text.  Claim 17 would then appear to require a "spacer block," a "resilient compression element" included in the spacer block that is configured for use with boards, and a "first board" and "second adjacent board" between which the spacer block sits.  National Nail's contrary interpretation arguably follows if the object of the phrase "configured to" does include the final clause of the italicized text.  On that reading, Claim 17 appears to require a "resilient compression element" configured to secure a spacer block between a "first board" and a "second adjacent board" without requiring the actual presence of either board.

      The Court concludes that National Nail's interpretation of Claim 17 is plausible and that any choice between that interpretation and PrimeSource's competing interpretation should occur after the parties have briefed claim construction issues.  *See Universal Connectivity Techs. Inc. v. Dell Techs. Inc.*, 2024 WL 3035627, at *5 (W.D. Tex. June 17, 2024) (whether requirement that a device be "configured to" operate with other devices also required the presence of the other devices was a question for claim construction), *rep. & rec. adopted*, 2024 WL 3282501 (W.D. Tex. July 2, 2024).

11

Because PrimeSource's motion to dismiss National Nail's claim for direct infringement depends on its competing interpretation of Claim 17, the Court denies the motion.

## B. Pre-Suit Induced Infringement of the '218 Patent

The Court next grants PrimeSource's motion to dismiss National Nail's claim for pre-suit induced infringement of the '218 Patent. National Nail has not sufficiently alleged that PrimeSource knew of the patent when it purportedly encouraged others to infringe it prior to the initiation of this suit. Although this deficiency requires dismissal of National Nail's pre-suit induced infringement claims as they are currently pled, the Court believes National Nail may be able to fix the deficiency and will allow National Nail to file an amended complaint.

A party who "actively induces infringement of a patent [is] liable as an infringer." 35 U.S.C. § 271(b). "[L]iability for induced infringement can only attach if the defendant knew of the patent and knew as well that 'the induced acts constitute patent infringement.'" *Commil USA, LLC v. Cisco Sys.*, 575 U.S. 632, 640 (2015) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011)).

National Nail's factual allegations do not plausibly suggest that PrimeSource knew of the '218 Patent before this litigation began. National Nail relies on two basic allegations. The first is its allegation that it marks its CAMO EdgeX Clip with the '218 Patent's number. Doc. No. 30 at 15 (citing Doc. No. 21 ¶ 31). The second is its allegation that it competes with PrimeSource by selling products to the same customers through the same distribution channels. *Id.* (citing Doc. No. 21 ¶ 32). These two

12

allegations indicate that PrimeSource could have learned of the '218 Patent in the pre-suit period but not much more. Sellers in some markets are unlikely to be aware of all products sold in those markets or all patents held by other market participants. The Court has no basis for inferring that the nature of the particular market National Nail and PrimeSource share led PrimeSource to examine National Nail's CAMO EdgeX Clips or otherwise discover the '218 Patent. *See Kirsch Rsch. & Dev., LLC v. Tarco Specialty Prod., Inc.*, 2021 WL 4555802, at *2 (W.D. Tex. Oct. 4, 2021); *MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 233 (D. Del. 2012). There is no indication, for example, that National Nail is one of a small number of major firms in a highly concentrated market or that the CAMO EdgeX Clip was a recognized threat to PrimeSource's competitive position. *Cf., e.g.*, *Nanosys, Inc., et al. v. QD Vision, Inc.*, 2017 WL 35511, at *2 (N.D. Cal. Jan. 4, 2017) (plaintiffs sufficiently alleged knowledge of patent where the parties were "the two primary players in a small market").

The Court concludes that National Nail has not sufficiently alleged PrimeSource's pre-suit knowledge of the '218 Patent and dismisses National Nail's claim for pre-suit induced infringement of the patent. The dismissal is without prejudice because National Nail may be able to allege additional facts about the market it shares with PrimeSource suggesting that PrimeSource had pre-suit knowledge of the '218 Patent. The Court emphasizes that it does not decide whether National Nail has stated a claim for post-suit induced infringement of any patent because the parties have

13

only asked the Court to consider National Nail's claim for pre-suit induced infringement.

### C. Pre-Suit Willful Infringement of the '218 Patent

The Court lastly grants PrimeSource's motion to dismiss National Nail's claim for pre-suit willful infringement of the '218 Patent because National Nail has not sufficiently alleged that PrimeSource acted willfully. To infringe a patent willfully, the infringer must know of the patent. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016). Since the Court concluded in Section III.B that National Nail has not plausibly pled PrimeSource's pre-suit knowledge of the '218 Patent, the Court concludes that PrimeSource's alleged pre-suit infringement of the patent was not plausibly willful. *See Kirsch*, 2021 WL 4555802, at *2; *Atlas Glob. Techs., LLC v. Sercomm Corp.*, 638 F. Supp. 3d 721, 729 (W.D. Tex. 2022). The Court notes that the parties have not asked the Court to pass on National Nail's claims for post-suit willful infringement.

### IV.  CONCLUSION

The Court **GRANTS** PrimeSource's Motion to Dismiss in part, **DENIES** it in part, and **DISMISSES** National Nail's claims for pre-suit induced and willful infringement of the '218 Patent without prejudice. National Nail **MAY FILE** an amended complaint within ten days of the entry of this order. If National Nail files an amended complaint, it shall confine its amendments to the claims dismissed in this order and

14

shall attach to the amended complaint a redline showing the differences between the amended complaint and the complaint it supersedes.

**SO ORDERED.**

Signed August 26th, 2024.

_____
ED KINKEADE
UNITED STATES DISTRICT JUDGE